## Harlan Coal and Land Company v. King Harlan Mining Company.

(Decided June 21, 1921.)

### Appeal from Harlan Circuit Court.

1. Mines and Minerals—Action for Royalties—Counterclaim.—In an action to recover certain sums alleged to be due in the way of royalties arising from a coal mining operation, there was presented a counterclaim resulting from construction of bridge piers. The contract between the parties was the result of correspondence in the form of letters and telegrams, an examination of which authorized the directed verdict in favor of the lessee.

2. Evidence—Introduction of Letters.—Where letters offered in evidence are not ambiguous, oral evidence is not admissible to explain them.

JAMES H. JEFFRIES and HALL & JONES for appellant.

SAMPSON & SAMPSON for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

The Harlan Coal and Land Company, incorporated, is the grantee and successor in title of the New York and Pennsylvania Coal & Coke Co., incorporated, to a large boundary of coal land in Harlan county, Kentucky, which is covered by the coal lease out of which this litigation grew and is the real party in interest on the side of the plaintiff-appellant, and shall be hereinafter called appellant or lessor.

Appellee, King Harlan Company, incorporated, is the lessee by assignment from King Harlan Mining Company, incorporated, of the said coal lands of appellant, on a 10 cent royalty basis, and will be referred to hereinafter as the lessee and appellee.

By this action lessor seeks to recover of lessee several named sums, due, it is charged, at different times for

royalty, amounting in the aggregate to $2,601. The answer of the lessee denied its indebtedness to lessor in any sum, and by counterclaim, in a second paragraph, asks judgment over against the plaintiff, lessor, for $2,-625.32 alleged to be the balance due lessee on the cost of the construction of the bridge piers which is the basis of this controversy. At the conclusion of the evidence for the plaintiff-lessor the court, on motion, directed a verdict for the defendant-lessee upon the whole case, including the counterclaim for $2,625.32. Judgment being entered accordingly the plaintiff appeals.

After the execution and acceptance of the said coal lease in 1913, all parties engaged themselves in trying to get rights of way for a spur railroad to be projected from the main line of the L. & N. R. R. situated on the north side of Cumberland river to the river's edge, at which point it was proposed to erect a coal tipple and other loading equipment, to which would be carried by aerial tram the coal from the leased property located on the south side of the river, where it would be loaded into railroad gons for shipment to market. Some time was spent in an unsuccessful effort to obtain rights of way on the north side of the river. Finally Dotson, the president of the lessor company, by letter, proposed to the lessee that a plan be worked out by which the railroad could be carried across the river five-eighths of a mile to the leased premises and thus obviate the necessity of obtaining so much space for rights of way on the north side of the river, as well as the expense of erecting and maintaining the proposed aerial tramway from the leased property on the south side of the river to the tipple on the north side of the river. This suggestion was carried out, but in order to do so the railroad company required the lessor and lessee to aid in the construction of the bridge across the river by paying the costs of the piers and certain other necessary work. As the lessor company owned other coal land up Yocum creek, the direction in which the proposed railroad was to be built, it was anxious to have the bridge and railroad cross the river and to induce the lessee company to do a certain part of the work, proposed to the lessee that it, lessor, would pay the cost of the bridge piers by either advancing the money to pay for the construction work or by allowing lessee to retain a certain per cent. of royalties for coal mined from the lease until the cost of the piers was restored to the lessee. This agreement was reached by correspon-

dence. A number of letters and telegrams which passed between the lessor and lessee were introduced in evidence at the trial by the plaintiff, and are relied upon by it to prove that the money which lessor agreed to advance for the construction of the bridge piers was merely a loan which lessee was to repay with interest within a reasonable time when its necessities for ready money were less importunate. The lessee, however, insists that lessor agreed, in consideration of lessee doing certain other things to the advantage of lessor, to build or cause the said bridge piers to be built at its exclusive expense and without hope of reimbursement from lessee.

This litigation, therefore, may be determined by gathering from the correspondence between the parties the contract into which they voluntarily entered and enforcing the same according to its term and the law governing such agreements. In order that the contract may be understood we copy the letters which evidence it, beginning with the first one by Dotson, April 6, 1915, suggesting that the bridge be built:

"Wise, Virginia, April 6th, 1915.

"Mr. A. H. Wood,

Petros, Tenn.

"Dear Sir:—I wrote you Saturday relative to completing rights of way. Mr. Lewis tells me the Ages creek people were to have a meeting in Knoxville today and he hoped they would then be in a position to grant you a satisfactory tipple site, which I hope they will. It has occurred to me that some arrangements advantageous to us all might be made to build a bridge across the river, to your plant jointly, and you could locate your tipple on that side of the river. If the L. & N. would furnish the steel, we could build it jointly and it would not cost you much more, if any, than to put in a conveyor across the river. Will be glad to know what you think of it, but don't let this interfere with the present negotiations for tipple site from Mr. Lewis.

"When do you expect to go to Harlan again? I expect to go over there again in a few days to complete the right of way.

"Yours truly, N. B. Dotson."

Following the foregoing letter by Dotson negotiations were begun between lessor and lessee looking to the construction of the bridge and railroad across the river. The railroad company had not agreed to the plan and both the lessor and lessee undertook to enlist it in the enterprise. As showing how the negotiations with the railroad were carried on we copy a letter from Wood, acting for the lessee, addressed to Dotson, who represented the lessor, dated June 8, 1915. It reads:

"Louisville, Ky., 6/8, 1915.

"Mr. N. B. Dotson,
        Wise, Va.

"Dear Mr. Dotson:

"We had an extended conference with Mr. Smith today, the result being set out in letter addressed to you and I which Mr. Williams is sending you copy of. I will write you tomorrow from Petros in detail in reference to same.

"Yours truly, A. H. Wood."

From a letter of May 22, 1915, written by Dotson for the lessor we take the following:

"P. S.—Since writing the above I have yours of the 20th inst. I would be glad to meet you and the L. & N. chief engineer in Harlan as you suggest, but I have a bad attack of rumatis and can hardly get around and can not make the trip. In my letter to Mr. Smith I quoted your letter to me in reference to putting the road across the river for us and offered further inducements, which I infer from the wire you have from the engineer in chief to you is satisfactory to them and the engineer I presume will have the location across the river made while he is there. I think it much to your interest as well as ours to have the road built across the river, and hope you can meet him on the ground at an early date, and show him just what you want, which I hope will be satisfactory to him. Sorry I can't go along.

"Yours truly, N. B. Dotson."

The railroad company finally agreed to do a certain part of the bridge work as evidenced by the following letter of June 8, 1915:

"Mr. A. H. Wood, Petros, Tenn.,

"Mr. N. B. Dotson, Wise, Va.,

"Gentlemen:

"This letter is to confirm agreement reached at conference in my office today relative to the suggested arrangement for installing mine tracks for coal operation on the upper end of the proposed extension of the Clover Fork spur, at which Messrs. Wood, Killebrew and Davis were present.

"It was agreed that the mining company and the owners of the property would take care of the cost of the mine track layout from the point it will leave the main spur, except the bridge spans with the creosoted bearing timbers, galvanized iron cover plants for the same and floor for the span, timber floor, bearing timbers and cover plates at its cost.

"I would advise that the railroad company will be willing to have the roadbed and masonry for your mine track layout constructed by its contractor, the Ryan Company, at the prices named in the contract between the Ryan Company and the railroad company, with five per cent. added to take care of the supervision, engineering, etc. For your information I would state that the principal prices of the contract are as follows:

| | |
|---|---:|
| Earth excavation | $ .24½ |
| Loose rock excavation | .33 |
| Solid rock excavation | .65 |
| Water excavation | 1.50 |
| Foundation excavation, dry | .50 |
| Concrete, class "B" (1:2½:5) | 5.75 |

No haul to be paid on excavated material.

"I would advise that the approximate estimate for the bridge is as follows:

| | |
|---|---:|
| 370 cys. concrete @ $5.75 | $2,127.50 |
| 100 cys. water excavation @ $1.50 | 150.00 |
| 400 yd. miles haul on materials @ .35 | 140.00 |
| 65,400 lbs. steel in place @ $.02 | 1,300.00 |
| 130 feet deck @ $2.00 | 260.00 |
| Creosoted bearing timbers | 88.00 |
| Galvanized iron cover plates | 15.00 |
| | $4,080.50 |
| 5 per cent. for engineering, supervision, etc. | 204.03 |
| | $4,284.53 |

"Of this amount the coal and land companies would take care of the first three, totaling, with the 5 per cent. added, $2,538.38, and the railroad company would take care of the last four, totaling $1,746.15.

"It is understood that the steel work, floor, etc., shall remain the property of the railroad company and it shall have the right to remove the same from the spur track at any time it may desire to do so.

"Yours truly,<br>
"(Signed) H. C. WILLIAMS,<br>
Chief Engineer of Construction."

The lessee by Wood wrote the lessor a letter on June 9, 1915, a part of which is pertinent, reading:

"Petros, Tenn., June 9, 1915.

"Mr. N. B. Dotson, Wise, Va.

"Dear Mr. Dotson:

"I presume you received a copy of Mr. Williams' letter which I told him to send you, but fearing that he didn't send it I am enclosing copy herewith.

"We did our best with Mr. Smith and could only get him to agree to furnish the steel and deck for the bridge. I had the help of two of our principal stockholders who are personal friends of Mr. Smith, and they thought under all the circumstances I did very well with him.

"I tried very hard to get Mr. Smith to build the bridge and the spur line up to our tipple tracks, but he insisted that we should build the line from where it leaves the main line, doing all the grading, furnish the ties and rails, or rather paying interest on the rails.

"The additional cost to us over the other plan would be between $2,500.00 and $3,000.00 if we do all the grading (about 10,000 yds. south of the bridge) and furnish the ties and rails. My people, Killebrew and Davis, agreed yesterday for me to stand this extra expense if you would build the bridge piers and other work mentioned in next to last paragraph of Mr. Williams' letter, estimated at $2,538.38, and of course furnish the right of way."

On August 2, 1915, the lessor wrote lessee a letter from which we take the following:

"Mr. A. H. Wood, Evarts, Ky.

"Dear Mr. Wood:

"I have put up about all the money that has been spent in connection with getting the railroad built to your plant location, and feel that someone else should put up some if it is to be put up, and I think I can arrange with Mr. Peery to do this. I have a pretty big man in N. Y., a stockholder in my company, that may advance some but has not put in any yet. However, if you want to have matter of track settled at once I don't want to delay the matter, and if your company will not put in *the peers for the R. R.* company and pay for them, and you can have *them put in the peers,* if I don't get some one else to pay for them, before the royalties on your lease begin to run, I will give you credit on royalties as they come due, giving you credit for 25 per cent of royalties as they come due until the cost of the peers have been reached. I hope this arrangement will be satisfactory to you, and if I do not have some one else meet the cost of the peers you will have the royalties as they *come due for the cost of them,* and get the R. R. across the river to your plant."

On August 16, 1915, lessee wrote lessor as follows:

"KING HARLAN MINING CO.

(Incorporated)

"General Offices, Nashville, Tenn.

Mines, Evarts, Harlan County, Ky.

"Petros, Tenn., Aug. 16, 1915

"Mr. N. B. Dotson, Wise, Virginia.

"Dear Mr. Dotson:

"I beg to hand you herewith the adopted track arrangement for crossing the river.

"You will note that the prominent feature of this arrangement is that we in substance get the main line across the river and the track 3/5 of a mile on toward Yocum creek, which I regard as an important accomplishment in connection with your property up Yocum. This arrangement of track gives us excellent facilities for handling our business, and I am well pleased with the results, even though it required so much effort, six revisions being made before it was gotten in final form; hope you will be pleased with the results.

"The contractors are now at work on Morgan Middleton land, and expect to cross the river by Thursday. I was sorry so much had to be paid for the right of way and I appreciate your prompt action in meeting the emergency.

"In regard to the payment for the piers, if your other stockholders don't respond, and I hope they will, our company will pay for the piers and deduct from the royalty as outlined by you in your letter of Aug. 2nd.

"We are pushing the work with vigor and hope to load coal by December.

"I expect to be back at Ages Thursday, and remain for four or five days.

"Yours very truly,

"A. H. Wood, General Manager."

The foregoing letters show how the arrangement to build the bridge piers came about; but the letter embracing the terms of the contract was written by lessor to lessee on August 21, 1915, at lessee's suggestion and as evidence and confirmation of the agreement entered into by the parties—we copy it in full:

"Wise, Virginia, Aug. 21, 1915.

"Mr. A. H. Wood,

King Harlan Mining Co., Ages, Kentucky.

"Dear Sir:

"As I wrote you some time ago, if your company will pay the cost of constructing the piers for a R. R. bridge across the Clover fork from Morgan Middleton lands to your plant, if I do not *repay* the cost of the pier to you before you commence to mine coal you can retain twenty-five per cent of the royalties, as they come due and payable to us until the cost of the piers has been retained out of royalties.

"Yours very truly."

A reversal of the judgment is urged by appellant, lessor, chiefly upon the grounds: (1) That the court erroneously directed the jury to find for the defendant, lessee. (2) Exclusion of other letters between the parties which would have been competent and controlling evidence for plaintiff. The second contention is the basis of the first, for if the evidence heard at the trial was all the evidence upon which plaintiff relied for a verdict we think it would be conceded that the trial court did not

err in directing the jury to find for defendant. Of course this conclusion is necessarily based upon a construction of the contract gleaned from the several letters and telegrams read at the trial as evidence. The letters are not ambiguous and need no oral testimony to explain them. Especially is the letter of date August 21, 1915, free from doubt, for it was written by lessor at the instance of the lessee in confirmation of the agreement reached by the two through the exchange of many letters, telegrams and messages, some of which referred to and confirmed conversations had between the leading spirits and chief officials of the two corporations. This letter is clear, direct and certain in its meaning. It is hardly susceptible of more than one construction. It first refers to the fact that on a previous occasion the writer had proposed to pay the cost of constructing the bridge piers, and says to the lessee that if it would build the piers and pay for them or get some one to do so I (the lessor) will repay you the cost thereof before you begin to run coal, but if I do not do so before coal is mined from the lease and royalties are due you can retain twenty-five per cent of the royalties as they come due and payable to us until the cost of the piers has been retained out of the royalties. There is no word in the letter to indicate that the lessor is loaning or advancing money to the lessee to build the piers; on the contrary, the letter expressly promises to *repay* the money to the lessee if it would pay for the building of the piers. What is meant by the word *repay?* Lexicographers define this word to mean to pay back; to make return for; to pay anew, or a second time, as a debt. Briefly it means to pay that which one has received either directly or indirectly, as if one should say to a friend, "Pay my hotel bill and I will repay you." If the friend should pay the bill he would be entitled as a matter of law to be reimbursed by the promisor, nor could the promisor claim that such a payment was a loan or advance and expect a recovery.

A loan is the temporary lending of money or other thing by one to another with the expectation by the one that the money or thing loaned will be returned by the other. No money was furnished or let by the lessor to lessee to pay for the bridge piers. But appellant insists that as it allowed lessee to retain money due as royalties as the piers were built it advanced money to

lessee, which is but another form of loan. So is an advance of money. But no money was in fact advanced by lessor to lessee and none was required because lessee was able, as it demonstrated, to raise the money from other sources to build the piers. The piers were contracted long before any money was retained by lessee out of the royalties and no part of the royalty money was used to build the piers.

We can think of no good, sound reason for lessor to have proposed and agreed to allow lessee to retain 25 per cent of the royalties from coal after the bridge piers were completed and paid for except upon the hypothesis that lessor owed lessee the cost of the piers, otherwise such a payment at that late date would have been of no service whatever to lessee. This construction is fully borne out by the letter of August 2, written by the lessor to lessee wherein it is said: "If your company will not put in the piers for the R. R. Co., and pay for them, and you can have them put in the piers, if I don't get some one else to pay for them before the royalties on your lease begin to run, I will give you credit on royalties as they come due, giving you credit for 25 per cent of royalties as they come due until the cost of the piers have been reached." There is no suggestion anywhere that lessor is making such payment with the hope of receiving it back. In fact it plainly appears that the lessee had refused to build the piers at its own expense and as a last resort the lessor agreed to pay for them out of the royalties if not before, if lessee would have them built. Lessor admits that it has not paid lessee the cost of the piers or any part thereof, except the sums retained by lessee out of royalties and for the recovery of which this suit was commenced.

If it be said that there was no reason or consideration for the lessor's promise to pay for the piers, that the building of the piers and erection of the bridge were the work of lessee, it will be sufficient answer to say that the bridge project was first suggested by lessor who wanted the royalties from other coal properties which it was then trying to lease to Wood and other parties. Moreover, the lessor, who was obligated to provide the railroad right of way and space for tipples and other loading apparatus on the north side of the river, would escape a part of the great expense incident to the pur-

chase of same by projecting the railroad across the river on to its own ground where it had plenty of space.

No doubt the controlling influence which induced Dotson and his company to agree to pay for the bridge piers was the advantage of having the railroad cross the river in the direction of its other coal properties, thus enabling it to make new leases. All the letters passing between lessee and lessor which were written before or near the time of the making of the contract concerning the construction of the bridge piers and which refer to the matter were admitted as evidence by the court, but other letters written at a subsequent date and which related to other subjects or to an adjustment of the claim sued on, were rejected by the trial court. This was not error, nor was the plaintiff entitled to introduce oral evidence to explain the letters or contract, for this is only allowable where there is ambiguity. There was, therefore, no substantial error committed against appellant by the court in confining the introduction of letters as evidence to those which related to the contract and which were written at the time or before it was made.

Another insistence of appellant is that the bridge piers cost much more than the estimate made by the chief engineer of the Louisville & Nashville Railroad Company fixed for this construction, and therefore appellant could not be held liable for the excess, which is about equal to the amount of the defendant's counterclaim. This position is not tenable. The estimate of the chief engineer of the railroad was accompanied by a letter to both lessor and lessee (copied above) which clearly shows that the estimate is only an approximation of the cost of the bridge and piers, and does not purport to be an exact or definite and certain statement of the cost of those things.

This estimate was not made by the lessee or any one connected with it but was made by the chief engineer of the Louisville & Nashville R. R. Co., at the instance of both the lessor and lessee and one was as much misled by it as the other, if either was misled. Although the piers did cost about twice as much as the estimate of the engineer, no fraud is charged, and the undertaking of the lessor to pay for the piers was not limited to the estimated costs but was one to pay the costs of the piers without regard to the estimate.

We find no reversible error in the record.

Judgment affirmed.